May it please the court. My name is Mark Forsberg. I'm the Deputy District Attorney in Carson City, Nevada. And I represent the city in this case. I'd like to open by just briefly Are you, excuse me, sir, are you splitting argument? Yes, I am. My intention is to share my argument time with the counsel for the amicus. Okay. Let's put the clock back to 20. And you watch, this clock is going to start counting down from 20. And whatever you're going to give opposing counsel, a rebuttal is going to come out of that. My endeavor is going to be to take about 10 seconds. Whatever you do is keep your eye on the clock. Okay. You're in the midst of your own time. Go ahead. Very well. Thank you. I'd like to briefly recap the facts of this case for you because I think they're important to understanding the role of the Deputy District Attorneys later on in the case. On June 27th of 1997, a Carson City Sheriff's Deputy pursued a vehicle that was being driven erratically in Carson City. And as he pursued that vehicle, it pulled into a motel parking lot, proceeded all the way to the back, and the driver jumped out and hopped over a fence into an adjoining mobile home park. Deputy Sloan, who was one of the original defendants, pulled up behind, observed that the driver had been a black male, saw him going over the fence, and pursued. Black male without a shirt, right? Black male without a shirt and carrying a backpack. And as he pursued this individual in the trailer park, he lost track of him and began to return to his vehicle and the vehicle he had been pursuing. As he was back at the vehicle preparing paperwork and doing an inventory whatever, he was hearing radio traffic on his epaulette radio of a black male running down the street adjacent to the trailer park, called in by citizens to the Sheriff's Department. And he noted that. Then a few moments later, another officer on a nearby street was driving up the street when a citizen pointed out another individual, a black male, hiding in the bushes. And that black male popped out of the bushes. This was Mr. Webb without dispute. And at the sight of the officer, Mr. Webb, according to the second officer, ran down an alley. And moments later, he was caught hiding. How did he magically go without a shirt? Well, the explanation in the mind of the officer is that he had a backpack with him. He could have had a shirt in it. It was a warm summer night. He was running from the police. He might have done that to change his appearance. And he could have had the shirt in the backpack. So the mere fact that this guy didn't have a shirt and this one did. I'm just stating a fact. Okay. It's complete in the picture. Thank you. So Mr. Webb was under the vehicle. Yet another officer found him there. The first officer, Deputy Sloan, came to the scene on foot. It was only maybe 100 or 200 yards away from the original stop. Because your time is limited. Yes, it was the usual sort of mix-up that happens when officers pursue suspects. They got the wrong guy. But now we're 10 days later, and the DA's told, Wait a minute, you got the wrong guy. You got the wrong guy. And the DA doesn't say, Oh, well, gee, we're really sorry. We're going to let you out of jail and apologize for the 10 days you spent there. He decides to prosecute him anyway, unless he signs a release. That's what this case is about, isn't it? It's not about the sort of grubby facts of what happened in the alley. It's about what happened in the calm of the prosecutor's office when he gets told you got the wrong guy. And instead of immediately releasing the innocent individual that was unfortunately ensnared in this police arrest, perhaps because he's black, perhaps not. You know, we don't know. But in any event, instead of saying, gee, we made a mistake, he insists, he conditions a release on his signing a release. And that strikes me as not so good. Well, let me give my answer to that. First of all, the reason I started with the facts is because I think that there's circumstantial evidence that Mr. Webb was driving the car. Even today, we don't know for sure whether Mr. Webb was or wasn't the guy driving the car. But you had a trial on this. You had your chance to pass all of this. You did have a trial, right? I'm sorry? There was a trial on this, right? There was a trial. So you had a chance to tell this to the jury. And we have to sort of pursue the facts in the light most favorable to the winning party, which I think was not you or your client. So I realize there are some disputes as to what the prosecutor thought or might have thought or might have believed. But consistent with the jury verdict, we have to assume that the jury believed that the prosecutor knew darn well that this guy was innocent and decided to use his power as a prosecutor not to release him and to force him to go to trial in a criminal case in order to extort a release from him. That's what we have to assume, isn't it? Isn't that what the jury was told? And isn't that what the verdict supports as an inference about the facts? So now we have to ask the question, is this legally sufficient? Isn't that where we are? In part. I am not disputing what the jury found. The jury, I believe, we can infer from their decision that they believed that Mr. Webb was not the driver of the car. We must also infer that your client, the prosecutor. Well, my client is not the prosecutor. The prosecutor believed, knew him not to be the driver of the car. Okay. That's consistent with the verdict. I mean, of course, if the jury thought that the prosecutor honestly thought he might be the driver, they would not have said, well, of course he keeps him in jail. But the fact that he says, but in that case, why is he asking for a release? If the prosecutor thinks the guy is really guilty, then he should prosecute him. Telling him, I'll let you go even though you're guilty if you sign the release, strikes me as a little odd. Well, it's odd, and I'm not here to explain that. But the reason he was proposing this devil's bargain was because the prosecutor was convinced that the guy was innocent. And he was using, I mean, couldn't infer that, couldn't it? That the guy was innocent, and he was trying to extort a release from him to protect his own and his county's pocketbook, right? I don't think that the prosecutor, that you can make an inference that the prosecutor was trying to extort a release. It was a minor case. Why not? The prosecutor comes in and says, look, we will release you if you sign a release. What? Now, if the guy, if the prosecutor thinks the guy really is guilty, then it seems to me he ought not to be releasing him. He ought to say, well, we think you might be guilty. We're going to go to trial regardless. When the prosecutor comes in, you know, we are willing to let you go if only you will save us from liability. Sounds to me like the jury could infer extortion from that. I'm not persuading otherwise, but that's, you know. This case doesn't turn on whether the prosecutor was using good judgment or bad judgment. Doesn't this case turn, as far as the questions that have been raised before us on issues that have really nothing to do with any of this, but rather with whether the prosecutor was in fact a, whether there was a policy here of the city and so on? I mean, the actual conclusion, as Judge Kuczynski has been saying, of the jury is a given. And what we're trying to decide is, is the thing the jury found a policy of the city, or was it just some renegade deputy district attorney who doesn't have final policymaking authority? So that's what we have to discuss. We're not discussing the case at this point. I agree. Why did you get into this whole thing with the facts in the parking lot? Well, because, I mean, it sounded to me like you were trying to fight the jury verdict. Fine, let's accept, well, let's accept the rogue prosecutor. And let's talk about whether it's a policy. If you want to go there, that's fine. Well, because part of the claims against the prosecutor are that they acted with malice, they acted with an improper motive, and on the state claims, that's relevant to whether the prosecutors remain within their state law discretionary act immunity. It doesn't have a bearing on the policymaking. So let me turn to that. There's no evidence presented at trial that a deputy district attorney was a policymaker. There are many ways to get to municipal liability through policymaking. There can be an express policy. There can be a pervasive practice and so forth. There can be ratification. All those things require some evidentiary basis for finding them. There wasn't any evidence like that. What did you do with Christie? I'm sorry? What did you do with Christie? I think Christie is the case that supports my position, where a deputy district attorney is not a policymaker, simply. Doesn't that depend entirely on the particular law of the state involved? It does. Okay. And I'd like you to look at Nevada revised statute 252.070 subsection 1, which says all district attorneys are authorized to appoint deputies who may transact all official business relating to the offices to the same extent as their principals. And that's the end of the quotation. And my question is whether that is a way of giving to deputies all the same authority, which we sometimes call policymaking authority, as the principal district attorney. And I argue that it does not. The term official business means those duties that a district attorney has to prosecute cases, to represent the county in civil matters, to appear at Board of Supervisors meetings and so forth. It does not make deputy DAs co-equal with the district attorney. To argue that it gives them. It says all official business to the same extent as their principals. Right. But it sounds to me like this is an agent that can exercise all of the powers of the principal. It is not an agent that's limited in the powers he may exercise. But if you carry that. I can't imagine writing a provision that was any broader. If you carry it to its logical conclusion, a deputy district attorney could appoint himself because he would have or appoint other deputy DAs. There isn't any evidence at all in the record with regard to actual practice to demonstrate, for example, that there were policies regarding prosecution or regarding what should have happened in a case like this, which were countermeasures. Is there anything in the record at all to show that what appears in the face of the statute is not so? There was testimony by a deputy district attorney that it's the policy of the office not to prosecute without probable cause. And there was testimony that deputy district attorneys have the discretion to pursue or dismiss prosecution. And there was nothing, for example, to show that you didn't introduce any internal training manuals or any internal policy statements or any internal flow charts as to who had responsibility to do what or anything. No. All we have is the statute. But the burden is on the plaintiff to show evidence. But he has the statute. It's possible that the statute means something in practice than what it actually shows on its face, but you didn't show any evidence that it does. No, but that's a question of law that we argued to the court, that this statute does not mean that deputy district attorneys have policymaking authority. And we showed we do. I can imagine that you may have been able to show it hasn't been interpreted that way, but you didn't do that. We didn't present evidence of it. Right. Or law, for that matter. We did present law. There are state cases that say this doesn't mean what it says? I think we've demonstrated that the law does not mean that deputy DAs have policymaking authority, either under the statute or the cases. I'm sorry. What do you cite for that? I cite the same statute, 272-07-0. The statute, to me, reads very broadly. There are several other statutes that would create thousands of policymakers in Nevada if that language gives them policymaking. That may simply mean that Nevada legislators have to be more careful in their drafting, or it could mean that the only way to deal with this is if a deputy gets out of line and exercises too much policymaking authority, he can be fired. And that's how you get rid of an agent who oversteps or who exercises his given authority in a way that the principal doesn't like. They can still be fired. Well, there would have to be some evidentiary line there that delineated out. There was no evidence presented. I think your co-counsel is anxious to get up. May it please the Court, my name is Brent Colvitt. I represent the Nevada Public Agency Insurance Pool, who has representation of 15 of the Nevada counties out of 17, plus many municipalities and special districts. Our concern in this case is, as the Court has focused in the last part of its questioning on the issue of what is a policymaker for purposes of establishing liability under Section 1983, the Court has asked the question, what does this statute mean? And I will give you another reason for the language in that particular statute. DAs have the obligation under the statute to prosecute. Their deputies, if not appointed under that statute, would be and their actions in those prosecutions could be subject to challenge, as was the case with the Attorney General's involvement in criminal cases. The reason that that language is as broad as it is, is to protect the process where a criminal defendant who is charged and accused of a crime cannot then say that the person prosecuting me didn't have the proper authority to sign the information or take other action with respect to that prosecution. I mean, that may be the case, and that may be a perfectly good reason to do that, but it may have unfortunate side effects. It may have the unfortunate side effect of, by avoiding one kind of problem, Nevada may have stepped into a different kind of problem, and that is to make each prosecutor a policymaker. Our Christie case does say that you can make policy in a particular case, even though it does not apply to future situations. It seems to me to fit like a glove a situation where a deputy DA is given all the powers of the DA and then makes a decision like this in a particular case. But a deputy is not given the ultimate power to make policy for the office. How do I know that? Well, in this particular case... I mean, it seems there's nothing in the statute that says he can't. There's nothing in the statute that says he can, and there's nothing in the statute that says he can't. Well, how about all? Can the district attorney set policy for the whole office? The district attorney can in some circumstances. Okay, and the statute says deputy may transact all official business related to the office to the same extent as their principals. It may. If you say the DA can, the statute says if the DA can, the deputy can, too. That's not what the statute says. The statute says that the district attorney may appoint a deputy. This is why I'm influenced by the lack of evidence. I'm not precluding the fact that you may have been able to come in and show that, in fact, first of all, what we're dealing with here is a discrete decision to prosecute, right? That the complete delegation hasn't occurred. Indeed, we have evidence that it has occurred. We had a testimony by a deputy district attorney that she had complete authority to drop that case or to prosecute it if she wanted to. So we have two things. We have the statute and we have that evidence, and we have no contrary evidence. We have nothing to demonstrate that she had to get any approval from anybody else or that there was any policies governing that. So we have nothing other than the statute and the testimony. Well, that may be an issue of the particular evidence in this case. That's what we have. We have this case. I understand that, Your Honor, but the issue to us is a much broader issue as to the authority of deputies in the state of Nevada in any department, any capacity, deputy attorney generals, deputy DAs, deputy assessors, deputy clerks. All of those statutes contain the same language that you're citing to here. And the point is the statute. A broad statutory language can be narrowed by all sorts of things. It can be narrowed by office directives, by manuals, by regulations, by the limitations in appointment papers. I realize there may be some costs and risks of doing that, but you have no evidence here at all that any of those were in play. In this particular case, the evidence may be slight on that, but there is the statutory issue of construction. What the court did here is use that one statute without looking at the rest of it, without looking at the other circumstances and making a determination which directed the jury to the verdict it reached. Counsel, when you say the rest of it, are you referring to the rest of 252.070 or are you referring to another statute? There are the same statutes involving all county officials. They have that same language in them. And you don't look at just a part of a statutory scheme. How does that help you, Ernie? To me, it's assuming they have the same language, it means that another legislature has been equally. Right. When you couple that with Pembauer and the other cases that look at the discretionary issue, you can't just look at the statute alone, and that's what the court did here. It didn't look beyond that. And the mere exercise of discretion in and of itself is not the delegation of policymaking, and that's the law that was used. But it's also true with regard to the other statutes that if you take the clerks, for example, that they're not policymaking people to begin with, except perhaps with respect to hiring and firing and things like that. But here we have a situation in which people are making decisions that one can logically call policy decisions, i.e., whether or not to prosecute somebody or not prosecute somebody. But those decisions are ultimately cloaked with the absolute immunity for the prosecutor. And what you're doing here in this case, if you allow this to stand, is basically disallowing the Ashelman decisions and that line of cases by putting a chilling effect on prosecutions that isn't intended anyway. And in this case, the only liability of the municipality is for the decision to prosecute or not, which is ultimately immune. And I'm over by 30 seconds. I was hoping to at least reserve a time for rebuttal, but apparently I can't. Thank you very much. Thank you. May it please the Court. My name is Robert Storey. I'm the attorney for David Webb. My impression of this case as the trial attorney is there's a boatload of evidence that there was a practice, custom, or policy in Carson City to prosecute without probable cause. And that's why the jury had so little trouble coming back with the verdict that they did. There were four. Wasn't the jury directed that the district attorney was a policymaker? Yes, but I'm talking about whether or not there was a custom policy or procedure. Well, why did they have to get to that if they were directed that the district attorney was? That's one of their charges. Just because you're a policymaker doesn't mean you're implementing a particular policy, and those are two different questions. My point is that there's a boatload of evidence here that Carson City does have a policy of prosecuting people without probable cause. And let me go through that evidence. First, this case was handled by Deputy Melanie Bruchetta. She sat on this case for 10 days, within which this guy who didn't commit any of his crimes was in jail. The next deputy district attorney that came along offered to plea bargain the case out. He said to Mr. Webb, if you plead guilty to the obstructing, we'll dismiss the other three traffic charges. Webb said no. Within a week of that, a third deputy district attorney dismissed those three charges, and the one obstructing case remained. By September 3rd, Ann Langer, the chief deputy district attorney for this jurisdiction, this is a minor misdemeanor case, but now we've got the chief deputy district attorney involved. She offers Webb a deal. She says, if you will sign a waiver of your liability, our liability, we'll dismiss this case. He says no. Within a week or so of that, chief deputy district attorney Langer runs into Webb in a public building in front of four or five members of the public and threatens Mr. Webb. Within a short period of time after that, chief deputy district attorney Langer says to Mr. Webb's attorney, the reason I'm prosecuting him is he didn't sign the waiver of civil liability. On October 30th, chief deputy district attorney Langer tried this case. So now we have four separate people involved in this case, and we have seven separate identifiable events that show that they prosecuted this case without probable cause. So the jury had no trouble finding this out. I submit that that is evidence of a top-to-bottom, wall-to-wall policy of prosecuting people without probable cause. Well, this person. I mean, you can't get beyond this person, but it's not clear that you need to. I'm sorry. I don't follow you. Prosecuting this person. This person, yes. Well, under Pembauer, all we need is one instance. That's right, but you were just somewhat exaggerating. Now that we can go beyond the fact that you're prosecuting this person. Yes, that's correct. There is scant evidence that there was some prosecution of other people improperly. I don't know what the jury did with that or didn't do with that, but Mr. Webb did testify that he's aware of three other cases where there was improper prosecution. Now, Deputy Bruchetta did indeed testify that they have a policy of not prosecuting without probable cause, but her testimony was not credible. In fact, I submit that she was disingenuous, if not downright dishonest, on the witness stand. She testified that the day that Deputy Sloan spoke with her, she immediately walked over to the Justice of the Peace and O.R.ed David Webb. The fact is, however, Deputy Sloan talked to her on the 7th, and Mr. Webb wasn't O.R.ed until the 16th. So there's 10 days that Mr. Webb sat in jail. In addition, Deputy Webb had submitted a written continuation report that was dated the 3rd. So there's plenty of evidence for the jury to disregard her uncredible testimony. Now, as I pointed out earlier, a single incident of improper prosecution is enough under Pembauer for liability under 42 U.S.C. 1983. So are you basically suggesting that we really don't even have to decide whether a single DA has sufficient authority here because the jury was entitled to infer from the fact that four people were involved over a period of time that this was a policy of the office as a whole? Well, the Ninth Circuit has said under Trevino v. Gates that that is a jury question, and I think there should be substantial deference to the jury. Do you know how big the office is? I don't. I know that there are at least five deputy DAs, the four that were involved in the trial. I'm actually not asking for your personal knowledge. When I say do we know, I mean is it in the records? From the record, you can tell that there are at least five plus a district attorney. Beyond that, I have no idea. There was a real dearth of proof on that particular issue. So I think it is a jury question. I think the jury did exactly what the evidence led them to, and they found prosecution without probable cause. But what was the jury instructed with regard to individual district attorneys and policymaking authority? They said that they were ñ I don't have the jury instruction in front of me. My recollection is that the jury is informed of that particular statute, and as a matter of law that they're a final policymaking person. Those are two separate questions from my perspective. You have a custom practice in policy, plus you have a final policymaking person. Now, clearly a secretary in the district attorney's office could not have made policy for the district attorney's office. But that's not what we have in this case. What we have are four separate deputy DAs, each having their fingers in this case, and each taking autonomous action to prosecute Mr. Webb without probable cause. Including the chief deputy? Including the chief. And the chief was the most ñ she had her fingerprints on this case more than any other person. And it strikes me as completely odd that you would put the chief deputy district attorney in charge of a minor misdemeanor problem. As this court has noted in the earlier conversation with Mr. Forsberg and Mr. Colvett, deputy district attorneys have the authority, the full authority of the district attorney. So it is our position that they are the final policymakers. We still have that same evidence that they were the final policymakers. So the big smoking gun here is the offer to drop the charges in exchange for the release, at least in my mind. Everything else you sort of ñ tell me a little bit about the evidence on that. Was there a dispute on that point? Well, there was no dispute as to it. It was a question that arose from Mr. Forsberg of my client, and he said, ìWhat evidence do you have of this?î And what Mr. Webb testified was that he was in his attorneyís office. His attorney got on the speakerphone with chief deputy district attorney Ann Langer. Ms. Langer offered him this deal over the speakerphone, and he said no. From my clientís perspective, it was a big deal. He felt he was humiliated, unhappy. Heíd been homeless from August until October 30th because of the way this worked out. He spent this 20 days in jail. He was drawn unemployment benefits. Because he wasnít out looking for work, he lost his unemployment benefits. And the upshot of this whole thing was that from August until October 30th, when his benefits were reinstated, Mr. Webb was homeless. He slept in the bushes of the Supreme Court Law Library, and he had food stamps. So for this whole period of time, he didnít have any place to live. This was a very big deal for Mr. Webb. And at the time that the chief deputy district attorney made this offer to him, he was homeless. He was unhappy about it, and he was determined to have his day in court. I think that youíre absolutely correct about that Christie v. Iopa case. That particular case shows that these deputy DAs are final policymaking people. In Christie v. Iopa, the assistant prosecutor hadó she couldnít change an indictment without going to her supervisor. We donít have those facts in this case. Moreover, as I recall, the Honolulu Charter specifically said that it wasnít clear as to what the delegation of authority was. What we have in this particular caseó Still having problems seeing how the two pieces fit together. Why do we have to decide whether an individual person is a final decision maker when we have, as youíve been stressing, evidence from which one could infer a customer policy, at least with regard to this particular personís decision, the decision to prosecute this particular person, i.e., that many different people were involved over a long period of time, and they all took a consistent position, which it seems to me one could infer was the policy of the office. My reading of Pim Bauer and his progeny is that is a two-part test by the Supreme Court. One, you have to show that there is a custom practice or policy within an office in order to prove part of the case. You also have to show that somebody with final policymaking authority actually carried it out. I mean, a deputy DA was a final policymaker, and it had been one district attorney who had done this whole entire thing and had never talked to anybody else. You couldnít win. No, I think I could. I think I could. Pim Bauer says one instance is enough. What I have here is more evidence than I probably need in order to prove my case. Weíve got four deputy DAs with their fingerprints all over this case, which shows independently that this was a custom practice and policy within this office. What Iím also stressing is that Nevada law delegates a great deal of authority, in fact, the full authority of a prosecuting attorney to his or her deputy district attorneys. What about the state law issue? Is there a state law issue thatís open at this point? Yeah. Thatís probably more interesting of the case. More what? Pardon me? I didnít hear what you said. Thatís probably the most interesting aspect of this case from my perspective. And Iíd like to point out that Carson City has waived that argument in any case. It was never raised until amicus raised it on this appeal. It wasnít raised in the pleadings. It wasnít raised during the trial. There wasnít a jury instruction on it. And it wasnít raised in the opening brief. What the amicus council did is sort of tangentially say, look, this is a prosecution. Therefore, these deputy DAs are not county officials. Theyíre actually state actors. There is a case out of this court. I think itís called Weiner v. San Diego County, which I wouldnít want to say parrots, but certainly draws heavily from a case called Pitts v. Kern County, where the California Supreme Court has said for criminal prosecution of state criminal offenses, prosecuting and assistant prosecuting attorneys are state actors. Therefore, thereís no liability under 42 U.S.C. 1983. I submit thatís not this case for several reasons. One, Nevada law is significantly different than California law. And as the Supreme Court said in the case of McMillan v. Monroe County, this is a question of law and it is state-by-state analysis. I actually had more in mind the discretionary function issue, which this issue really wasnít raised. What about the discretionary function issue? Was that raised? Actually, I think it was, and I think I misstated in my brief. I went back and looked when I was preparing for this, and I think they did raise it as an affirmative defense, discretionary issue. I submit they donít haveóthere are certain things that a prosecuting attorney has discretion to do, and let me give you an example. Assume for a moment that a prosecuting office has limited resources. They can make a discretionary decision whether or not to prosecute, say, violent crimes at the expense of nonviolent property crimes. Thatís a discretionary act that they can make. The discretion that they donít have is to prosecute without the elements of a crime, and one of the elements of every crime is probable cause that the crime existed. So there was no discretion in this case. They had no discretion to go ahead and prosecute Mr. Webb. They simply couldnít prove the case, and what they did in this case is yank him through a keyhole, make him spend 20 days in jail, and suffer the humility of a criminal trial. So I donít think there was any discretion whatsoever in this particular case. In any case, are you asking the question because of the immunity that there is under State law? Iím askingóyes, essentially. Does it matter to the judgment in this case, in the end? It does under the State law case. If thereóif Carson City deputy DAsó Were there two separate judgments in terms of damages? There were five. Amounts of damages. The jury foundótheir verdict came back with five different claims against Carson City. One was false arrest or false imprisonment because they left him in jail for that additional 10 days. The second one was malicious prosecution because they prosecuted him without probable cause. There are three State law claimsófalse arrest or false imprisonment, malicious prosecutionó and thereís another State law claim called abusive process where they were attempting to prosecute him in order to extract a civil waiver of liability. And I submitóand the jury concludedóthat Carson City had actually abused its discretion in prosecuting Webb. They had no discretion in this case. They simply acted in bad faith. You may have discretion among which criminals you choose to prosecute. You may have discretion in what kind of charges you bring against particular criminals. You do not have discretion and should never have discretion to prosecute without probable cause. And thatís exactly what happened in this case. If the Court has no further questions, I have nothing further to add. Okay, thank you. Thank you. Weíll give you a minute for rebuttal. Thank you, Your Honor. If you look at the cases where deputy district attorneys have been found to be policymakers, thereís always, always been evidence in the record that this policymaking authority was delegated to them by the district attorney. Thereís not any cases where theyíre found to be, as a matter of law, policymakers. But they donít have a statute like this. I mean, you know, who needs a member from the DA when youíve got the State legislature saying, ìYou got it all.î But if you interpret it that way, then deputy DAs arenít even answerable to the DA himself. They can be fired. They can be fired. It means that when theyó They would be co-equal with the DA because they would have the same authority. No, but thatís just not true. They can be fired. If the DA says, ìYou donít exercise statutory authority in certain ways,î and then they do it anyway, and if you had evidence that the DA had said, ìLook, youíve got very broad statutory authority, but here, by internal memo, hereís how itís limited,î and theyó But you donít have that evidence here. And the DA doesnít like the way they exercise their authority, you fire them. But that doesnít change the fact that while they are deputies, while they are empowered of this, they have the power. Itís not maybe the best way of drafting, but hey. What youíre doing is creating respondeat superior liability for the city based onó Weíre not creating anything at all. We are taking what the Nevada legislature, in its wisdom, has chosen to do and treating itó Iíd just like to answer one other question, Your Honor. The judge, the jury instruction said, ìThe acts or omissions of a deputy district attorney constitute official policy of the city and county of Carson City.î And he said, in making his ruling on our Rule 50 motion, that a deputy district attorney is a policymaker just based on the position she holds. So those are the two points. I have one last question, and I know your time has run out. And that has to do with the discretionary function exception. Was that issue raised in your Rule 50 motion? Yes, it was. And if I could justówell, thank you very much. Okay, thank you. Well, this is a messy case, and the facts are not all that savory. Let me suggest that counsel, while theyíre here together, including the guy from the insurance fund, may profit from getting together and trying to settle this case. You know, jury verdicts speak quite loud, and I donít know how weíre going to decide it, but probably weíre going to have to publish an opinion and mention what various lawyers did. And thatís not going to be nice, probably, whichever way it comes out. Is there any chance that counsel might get together and reach a settlement? We will defer submission for a week. Look, if you needóand if we donít hear otherwise from counsel, we will submit the case in a week and then do whatever weíre going to do. We also have mediators in the building, and if you have any interest in availing yourselves of theótheyíre very good. They are really very good. And this strikes me as a case where their help might very well be useful. So we will defer submission for a week, and if we hear from counsel or from the mediators to defer submission further, we will do that. If we hear nothing, we will assume that it didnít work out and that we will then submit and, of course, decide the case as we must. Thank you, counsel. Weíll take a five-minute recess.
judges: Kozinski, Graber, Berzon